UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re ) | |
| ) | |
| GARY L. GOODWIN and ) | Case No.  6:05-bk-10308-KSJ |
| MARY K. GOODWIN, ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| ) | |
| ) | |
| PHILIP W. HEARN, JOHN ELY, ) | |
| and JOSEPH ROBERSON, ) | |
| ) | Adv. Pro. 6:05-ap-336 |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| GARY GOODWIN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

MEMORANDUM OPINION ON
<u>COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT</u>

This case came on for hearing on July 17, 2006, on the Complaint to Determine Non-Dischargeability of Debt (the "Complaint") (Doc. No. 1) pursuant to 11 U.S.C. § 523(a)(4) filed by the plaintiffs, Philip W. Hearn, John Ely, and Joseph Roberson, against the debtor/defendant, Gary L. Goodwin. The issue is whether the defendant can discharge any debt he may owe as a plan trustee under a terminated profit sharing plan to the plaintiffs, who are each beneficiaries under the plan.  After considering the evidence, the Court holds that the defendant's debts to the plaintiffs are non-dischargeable and will enter a judgment in favor of the plaintiffs.

The plaintiffs each worked for a family-owned construction company, the P.J. Goodwin Corporation, for many years.[1] Each of the plaintiffs had managerial responsibilities and was well

---

[1]     Mr. Ely, Mr. Hearn, and Mr. Roberson worked for the defendant and his company for 11, 14, and 17 years, respectively.

compensated. The plaintiffs, together with several other employees, participated in the P.J. Goodwin Corporation Profit-Sharing Trust that was established by the corporation on May 25, 1970 (the "Trust").

The debtor ran his family's business and served as trustee of the Trust since 1972. In that capacity, Goodwin controlled and, with some limited assistance from investment advisors, invested the plan funds. Goodwin, as plan trustee and administrator, made questionable investment decisions. The most damaging decision was his choice to invest the Trust's assets into a condominium project in Georgia that proved to be unprofitable and resulted in the loss of nearly all of the plan's funds. (Defendant's Exh. Nos. 12 – 18). In connection with this project, Goodwin obtained a $360,000 loan that was payable in one year and was secured by the Trust's assets. Significantly, Goodwin also personally guaranteed the repayment of the loan. (Defendant's Exh. No. 14). At the time this loan was made, the Trust's assets were substantially less than $360,000, and the only hope of repayment was the completion and sale of the condominium units, which did not happen.

When the Trust was unable to repay the loan, the lender began litigation to recover the Trust's assets, which consisted, in large part, of the Trust's interest in the Georgia condominium project. In March 1986, the lender and Goodwin, on behalf of the Trust, executed a Deed in Lieu of Foreclosure conveying the Trust's interest in the Georgia condominium project to the lender in exchange for the lender's agreement not to foreclose or to seek a deficiency judgment. (Defendant's Exh. No. 16). Goodwin also obtained an important personal benefit insofar as he was released from his personal guaranty of repayment. As a result of the failed investments, the Trust sustained losses and the company's profit sharing plan was terminated effective on June 30, 1984 (the "Termination Date"). The plaintiffs were each 100 percent vested in the plan on the Termination Date.

On July 1, 1986, Goodwin called a meeting to inform the trust participants that the Trust had been terminated. At the meeting, the trust participants, including the plaintiffs, were each given a balance sheet reflecting their individual balance/vested interest in the plan as of the Termination Date.[2]  Goodwin explained that no contributions had been made into the plan since June 30, 1983, that the plan was terminated on June 30, 1984, and that the plan was under investigation by the United States Department of Labor (the "Department") but that no announcement had been made concerning when the investigation would be complete.[3]

Also at the meeting, Goodwin presented a proposal for compensating each of the plan participants. He proposed to pay each participant their vested balance as of the Termination Date within three years provided that all participants unanimously agreed with the terms of the proposal. (Defendant's Exh. No. 2).   After some discussion, the meeting attendees requested time to review the proposal and to have an opportunity to contact the Department prior to entering into any agreement.[4]

---

[2]   On the last statement provided by the defendant on September 23, 2002, for the year ending June 30, 2002, the value of Mr. Hearn's vested interest was $63,145.23, the value of Mr. Ely's vested interest was $29,237.37, and the value of Mr. Roberson's vested interest was $77,636.62. (Plaintiffs' Exh. Nos. 4, 5, and 6).

[3]   The Court could not discern if the Department was actively investigating improprieties in connection with P.J. Goodwin's profit sharing plan in 1986.  However, approximately 19 years later, the Department notified Goodwin that it had concluded its investigation of the plan and of the defendant's activities as trustee/named fiduciary under the plan instrument by way of a certified letter dated August 31, 2005. (Plaintiffs' Exh. No. 3).  The Court cannot be certain whether the investigation referenced in the letter was the investigation commenced in or around 1986 or whether the letter referenced a subsequent, more recent investigation into the plan. The letter did, however, conclude that Goodwin breached certain duties under ERISA in his capacity as plan trustee and named fiduciary. (Plaintiff's Exh. No. 3, p. 5).

[4]   Mr. Roberson later sent the Department a letter containing his account balance sheet, the defendant's proposed reimbursement agreement, and the minutes from the July 1, 1986 meeting. (Defendant's Exh. No. 6).

To accommodate this request, Goodwin scheduled a second meeting on July 22, 1986. At that meeting, which was attended by some but not all of the plaintiffs, it was clear the plan participants would not unanimously agree to the proposal to settle the matter. They were dissatisfied and chose to wait for the Department to continue with its investigation. On July 23, 1986, the defendant wrote a letter to the plan participants reflecting this and stating that every effort would be made to keep them informed of any developments on the issue. (Defendant's Exh. No. 5).

Goodwin did have later communications with the Department. On March 28, 1988, Goodwin wrote to and told the Department that he intended to reimburse the Trust in full as the Department had, in some earlier communication, instructed. The defendant also provided that repayment would include interest accruing from June 30, 1984, and that he would guarantee repayment with a personal note he would execute on April 30, 1988.[5] (Defendant's Exh. No. 7).

Goodwin made similar representations to the plaintiffs when he started sending them annual reports on behalf of the Trust. In the 1989 Summary Annual Report supplied to the plaintiffs by Goodwin, the defendant represented that he, as trustee, had "agreed with the Department of Labor to restore the plans [sic] assets and stated interest until all funds are recovered and final distribution is made to the participants." (Defendant's Exh. No. 11, p. 2). Consistent with this representation, Goodwin made the required payment to every plan participant, *other* than the plaintiffs.[6]

---

[5]   The defendant proposed reimbursement as follows:

| | |
|---|---|
| Original Amount: | $102,340.00 |
| Interest at 5.25% to 12-31-88: | $26,541.00 |
| Total due at 12-21-88: | $128,881.00 |

[6]   The defendant reimbursed the Trust sufficient amounts to pay claims of approximately 13 plan participants who were owed smaller amounts than the plaintiffs. The last of these distributions was made in 1992.

Goodwin made similar and repeated reassurances to the plaintiffs over the next 16 years. On October 9, 1990, the defendant informed the plan participants that plan assets had increased, that $15,000 had already been paid on a personal note guaranteeing the Trust's reimbursement, and that he intended "to fully distribute to each participant their share of assets." (Defendant's Exh. No. 8).

Moreover, from 1989 until 2002, the defendant credibly demonstrated the capacity to make good on his promises to reimburse or otherwise fund the trust so that plan participants would receive the full value of their respective contributions/amounts owed under the Trust when they became due. During these years, certified public accountants employed by Goodwin on behalf of the Trust prepared tax returns, summary annual reports and profit sharing certificates. The accountants preparing these reports and returns relied on information supplied by Goodwin reflecting the value of the Trust's assets. (Defendant's Exh. Nos. 10 and 11). Much of this information was sent to the plan participants, including the plaintiffs. In reviewing the various reports and materials sent to the plaintiffs since 1986, the Court finds that a primary reason Goodwin sent these materials to the plaintiffs was to induce them to believe that the Trust was fully funded, that their account funds would be available upon their retirement, and that any prior question regarding funding was resolved.

The Court further finds that Goodwin manipulated the information he provided to the Trust's accountants in order to encourage the plan participants (and perhaps the Department as well) to rely on his representation that the Trust had sufficient funds to pay claims. In order to pay the amounts owed to the plaintiffs as of the Termination Date, the Trust needed assets of $170,019.22. In 10 out of the 14 years from 1989 until 2002, the accountants' reports showed an *increase* in plan funds. Specifically, the reports valued the plan assets as follows:

$140,622.80 as of June 30, 1989
$147,772.11 as of June 30, 1990

> $135,974.67 as of June 30, 1991
> $128,704.64 as of June 30, 1992
> $112,972.29 as of June 30, 1993
> $114,371.75 as of June 30, 1994
> $115,876.72 as of June 30, 1995
> $117,415.55 as of June 30, 1996
> $126,445.45 as of June 30, 1997
> $138,498.68 as of June 30, 1998
> $150,983.15 as of June 30, 1999
> $168,364.16 as of June 30, 2000
> $168,461.81 as of June 30, 2001
> $170,019.22 as of June 30, 2002.

Thus, in 2002, the reports supplied to the plaintiffs by the defendant showed that the plan had exactly sufficient assets, $170,019.22, to fund the total amount of benefits owed to the plaintiffs under the plan. A plain reading of the accountants' reports is that, first, the Trust had assets, and second, the assets were increasing in value.

The plaintiffs each testified that they relied on these reports and believed they would receive their respective payments when they retired. However, because the plaintiffs had not yet reached retirement age, they had not sought to withdraw their funds. Thus, although they were certainly aware that there were problems with the plan's investments resulting in the plan's official termination years ago, they had no reason to believe, based on the defendant's regular and repeated assurances, as reflected in the reports supplied throughout the years, that they would not receive most, if not the entire, amount of their vested interests as of the Termination Date.

Of course, Goodwin's assurances were false. The Trust has hard assets of a very de minimus value. Rather, the accountants relied upon Goodwin's repeated confirmation that he was personally liable for the unpaid obligation. From 1986 forward, the primary asset of the Trust was Goodwin's repeated promise to repay the monies lost by the Trust and to make the payments required. Different accountants treated this promise to pay by Goodwin in different

ways on the reports prepared over the years, but the one constant was that Goodwin's obligation to pay was the key asset of the Trust. Interestingly, none of the Annual Summary Reports sent to the plaintiffs ever listed the specific trust assets or gave them any information that would inform them that the Trust's ability to pay their retirement funds rested, in turn, upon Goodwin's ability to pay the funds promised to the Trust.

The plaintiffs credibly testified that the first time they had notice that their retirement monies were in jeopardy was when they received notice that the defendant had filed this bankruptcy case. Indeed, Mr. Hearn testified that his pension funds for many years had been listed, and indeed were still listed, as an asset on his personal financial statements, which he had provided to a bonding company to rely on for issuance of a bond in connection with his post-P.J Goodwin employment in the construction field.

On September 9, 2005, the defendant filed this bankruptcy case and listed the debt to the plaintiffs together with a debt to the Department and characterized the obligation as an unsecured, contingent liability. He filed the case nine days after the Department sent him a certified letter dated August 31, 2005 (Plaintiffs' Exh. No. 3) notifying him that he had breached certain duties under ERISA.[7] The plaintiffs then timely filed this adversary proceeding seeking a judgment that Goodwin's obligations to them under the Trust are nondischargeable pursuant to Bankruptcy Code Section 523(a)(4). Plaintiffs also seek an award of their attorney's fees and costs against the debtor incurred in connection with this adversary proceeding. Likewise, in his Answer, the defendant sought fees and costs from the plaintiffs.

Bankruptcy Code[8] Section 523(a)(4) excepts from discharge any debt for fraud or defalcation when a debtor is acting in a fiduciary capacity. "In order for a debt to be non-

---

[7] The Department noted a number of breaches by Goodwin, including: (1) the failure to administer Trust assets appropriately; (2) the failure to supply reports for 2003 and 2004; (3) the failure to maintain a fidelity bond; and (4) the failure to maintain plan records.

[8] Unless otherwise stated, all references to the Bankruptcy Code herein refer to Title 11 of the United States Code.

dischargeable under the 'defalcation' provision, the Court must find both that a fiduciary relationship existed and that a defalcation occurred." In re Pleeter, 293 B.R. 812, 816 (Bankr.S.D.Fla.2003) (citing In re Codias, 78 B.R. 344, 346 (Bankr.S.D.Fla.1987)). Fiduciary relationships are determined by federal bankruptcy law, Cladakis v. Triggiano (In re Triggiano), 132 B.R. 486, 490 (Bankr.M.D.Fla.1991), and are narrowly defined. Quaif v. Johnson (In re Quaif), 4 F.3d 950, 952 (11th Cir.1993). "[T]he traditional meaning of the term 'fiduciary'-- a relationship involving confidence, trust and good faith--[is] far too broad for bankruptcy purposes." In re Futch, 265 B.R. 283, 287 (Bankr.M.D.Fla.2001) (citing Clark v. Allen (In re Allen), 206 B.R. 602, 606 (Bankr.M.D.Fla.1997) (quoting Liberty Nat'l Bank v. Wing (In re Wing), 96 B.R. 369, 374 (Bankr.M.D.Fla.1989))).

In the bankruptcy context, the "fiduciary relationship necessary for an exception to discharge requires the existence of an express or technical trust… which exists when there is a segregated trust *res*, an identifiable beneficiary, and trust duties established by contract or statute," Futch, 265 B.R. at 287 (citing Am. Sur. & Cas. Co. v. Hutchinson (In re Hutchinson), 193 B.R. 61, 65 (Bankr.M.D.Fla.1996), "which expressly impose[] fiduciary obligations on a party." Hayton v. Eichelberger (In re Eichelberger), 100 B.R. 861, 864 (Bankr.S.D.Tex.1989) (citations omitted). Generally, if specific fiduciary duties are set forth and the *res* of a trust arising prior to the act which created the debt is identified, Section 523(a)(4)'s criteria for nondischargeability is met. Matter of Musgrove, 187 B.R. 808, 814 (Bankr.N.D.Ga.1995) (citations omitted).

In this case, the defendant's fiduciary duties, the trust *res*, and trust beneficiaries arise under ERISA, Title 29 of the United States Code, and the plan instrument. "Individuals are considered 'fiduciaries' under ERISA if they are 'named fiduciaries' in the employee benefits

plan, pursuant to ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2)".[9] Thibodeaux v. Grant Enterprise, Ltd., 2003 WL 1618562, *2 (E.D.La.2003). An individual also can be deemed a fiduciary if they have any discretionary authority or responsibility with respect to the administration of the plan. Thibodeaux, 2003 WL 1618562, *2 (citing ERISA § 3(21)(A)[10], 29 U.S.C. § 1002(21)(A)).

Here, Goodwin was the "named fiduciary" under the employee profit sharing plan administered in accordance with ERISA. (Defendant's Exh. No. 1, pp. 3 and 73-77). The *res* is the plan itself, Musgrove, 187 B.R. at 814, the beneficiaries are the plan participants, and the defendant's fiduciary duties arose when the plan was created, prior to any individual debt to a specific beneficiary. Musgrove, 187 B.R. at 814 (citing 29 U.S.C. § 1002(21)(A); Payonk v. HMW Indus., Inc., 883 F.2d 221, 225 (3d Cir.1989) (discussing when ERISA's fiduciary duties attach)). Thus, Goodwin was unquestionably a fiduciary for the purposes of Section 523(a)(4).

Therefore, the only remaining issue under Section 523(a)(4) is whether the plaintiffs sufficiently proved defalcation on the part of the defendant. "Defalcation" has been defined as a failure to account for or to produce funds entrusted to a fiduciary. Quaif, 4 F.3d at 955; In re Touchstone, 149 B.R. 721 (Bankr. S.D. Fla. 1993). Defalcation does not require the element of intent and does not require substantial culpability or misconduct. Touchstone, 149 B.R. at 728.

---

[9]    29 U.S.C.A. § 1102 provides, in relevant part as follows:

§ 1102. Establishment of plan

(a) Named fiduciaries

. . .

(2) For purposes of this subchapter, the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.

[10]    ERISA Section 3(21)(A) defines a fiduciary as a person who (i). . .exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (iii) … has any discretionary authority or discretionary responsibility in the administration of such plan.

Negligence or ignorance may be defalcation. In re Codias, 78 B.R. at 346. Creating a debt by breaching a fiduciary duty is sufficient to constitute defalcation, even in the absence of evidence of bad faith. In re Menendez, 107 B.R. 789, 792 (Bankr.S.D.Fla.1989).

Several facts lead the Court to conclude that the defendant committed defalcation sufficient to render the debts due to the plaintiffs nondischargeable in this case. Article XVII, Section 17.6 of the Trust imposed a duty upon the defendant to act prudently, specifically, to discharge his duties in connection with the Trust:

> "solely in the interest of the Participants in the Plan and their Beneficiaries and [:] A. for the exclusive purpose of providing benefits to such Participants and their Beneficiaries and defraying reasonable expenses of administering the Plan; B. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; C. by diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and D. in accordance with the provisions of this instrument insofar as they are consistent with the provisions of ERISA, as the same may be from time to time amended. (Defendant's Exh. No. 1, p. 67).

Goodwin breached several of his fiduciary obligations. He failed to diversify plan investments so as to minimize the risk of substantial losses. Instead, he sunk nearly all of the Trust's assets into a single, risky condominium project in Georgia that ultimately failed. The only diversification in the portfolio consisted of a relatively de minimus amount invested in diamonds, silver and gold.

Goodwin also failed to act solely in the interests of the plan participants and their beneficiaries. In connection with the condominium project, the defendant obtained a loan in excess of $360,000 on behalf of the Trust. He personally guaranteed the loan, and, when the lender sought to foreclose, he quickly executed a Deed in Lieu of Foreclosure relinquishing the Trust's interest in the condominium project to the lender in exchange for a release of his personal

guaranty. In so doing, the defendant traded away Trust assets and placed his own interests above those of the Trust in violation of his duties as plan trustee.

Moreover, Goodwin failed to truthfully account for Trust assets over the last two decades.  He led the plaintiffs to believe that he had entered into an agreement with the Department to restore the Trust's assets when, in fact, there was no such agreement. For years, the defendant regularly and repeatedly misrepresented the amount of funds in the Trust. Cumulatively, Goodwin ignored his fiduciary obligations under the Trust, lost the hard-earned profits previously deposited into the Trust, which he was obligated to invest prudently in the best interest of the plan participants, and then, through the Annual Summary Reports sent to the plan participants, routinely misrepresented, and later failed to account for, the Trust's assets. Goodwin's misconduct started in 1986 with his poor investment decisions. However, Goodwin committed many additional breaches of his fiduciary duty when he created an elaborate scheme to deceive both the Trust's accountants and the plan participants about the true nature of the Trust's losses.  Goodwin clearly committed fraud or defalcation while acting in a fiduciary capacity.

In response, Goodwin asserts that the plaintiffs are time-barred from bringing this action pursuant to the time limitations provided in 29 U.S.C. § 1113.  Goodwin specifically argues that the plaintiffs had knowledge of losses of Trust assets as early as July 1, 1986, when he held the meeting to inform the plan participants that the Trust had been terminated and that the Department was investigating. Section 1113 of Title 29 of the United States Code provides as follows:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission on the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Applying this statute of limitation under 29 U.S.C. § 1113, the Court would hold that the relevant time period has not expired because of Goodwin's continuing and elaborate concealment of the true status of the Trust's assets. The defendant grossly overstated and otherwise misrepresented the value of the Trust's assets in the information he supplied to the accountants preparing the Trust's reports, which were intended for distribution to the plaintiffs and to the Department. Because the defendant concealed the actual, and substantially lesser, value of the Trust's assets, the plaintiffs did not have any reason to believe their retirement monies would not arrive when requested.

Had the Department not called the defendant's bluff in their letter of August 31, 2005 (Plaintiffs' Ex. No. 3), concluding that Goodwin had breached his fiduciary obligations, the Court is confident that Goodwin would have continued to hire accountants to send false Summary Annual Reports every year (or so) to these three remaining plan participants, thereby delaying even further the discovery of his many breaches of fiduciary duty. The Department's letter is the precipitating factor causing Goodwin to file this bankruptcy case just days later, on September 9, 2005. But for this bankruptcy filing, the plaintiffs would not have discovered Goodwin's fraud until they first sought to get their monies released. As such, assuming the ERISA statute of limitations controls, the Court holds that, due to Goodwin's fraud and

concealment, the plaintiffs have timely filed this action within six years[11] (and actually much earlier) after the date of the discovery of such breach—the date of the bankruptcy filing.

Lastly, Goodwin also asserts as affirmative defenses that the plaintiffs had full and complete knowledge of the investments made by him on behalf of the Trust, consented to the investments, and are now estopped from complaining that the investments lost money. However, consent and estoppel are invalid defenses here. The plaintiffs had no authority or control over plan investments, were not charged with any duties in terms of plan administration, and were not named in the plan instrument. That the plaintiffs had some general knowledge of the plan's investments and failed to object is simply irrelevant. A trustee with fiduciary obligations to administer an employee profit sharing plan cannot escape liability by making a belated disclosure of the imprudent investment. Furthermore, on these facts, the Court would find that the plaintiffs never consented to Goodwin's improper actions in any way.

Based on the above, the Court holds that the defendant's debts to the plaintiffs are properly excepted from discharge pursuant to Bankruptcy Code Section 523(a)(4). Specifically, pursuant to the Summary Annual Report, dated September 23, 2002, for the year ending June 30, 2002, Goodwin owes Mr. Hearn the sum of $63,145.23, Mr. Ely the sum of $29,237.37, and Mr. Roberson the sum of $77,636.62.

Finally, the Court will address the parties' mutual requests for their fees and costs incurred in litigating this adversary proceeding. "Section 523 does not expressly state that creditors successful in dischargeability proceedings are entitled to recover attorney's fees." TranSouth Financial Corp. of Florida v. Johnson, 931 F.2d 1505, 1507 (11th Cir. 1991). However, "[i]f a creditor is able to establish the requisite elements of Section 523, the creditor is entitled to collect 'the whole of any debt' he is owed by the debtor." Id. (citing In re Martin

---

[11] This adversary proceeding was filed on December 16, 2005.

(Martin v. Bank of Germantown), 761 F.2d 1163, 1168 (6th Cir.1985). In TranSouth, the Court of Appeals for the Eleventh Circuit specifically interpreted the Bankruptcy Code's definition of "debt," which was then provided in Bankruptcy Code Section 101(11), to encompass a creditor's contractual attorney's fees. TranSouth, 931 F.2d at 1507. The Court reasoned that "attorney's fees are properly awarded to a creditor prevailing in a bankruptcy claim if there exists a statute or valid contract providing therefor." Id. (citing Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967); In re Martin, 761 F.2d at 1168; Nat Harrison Assoc., Inc. v. Gulf States Utilities Co., 491 F.2d 578, 588-589 (5th Cir.1974)); See also, In re Martinez, 416 F.3d 1286, 1288 (11th Cir. 2005) ("Generally, in federal litigation, including bankruptcy litigation, a prevailing litigant may not collect an attorney's fee from his opponent unless authorized by either a federal statute or an enforceable contract between the parties.") (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); In re Fox, 725 F.2d 661, 662 (11th Cir.1984)).

In this case, the plan instrument is silent on the issue of whether a prevailing party is entitled to recover fees and costs against the losing party in litigation against the plan trustee asserting breach of his fiduciary duties. Nevertheless, the Court would find that the federal ERISA statute specifically contemplates that reasonable fees and costs may be awarded to either party. In Kemmerer v. ICI Americas Inc., 70 F.3d 281, 288 (3d Cir.1995), the Court of Appeals for the Third Circuit explained that a pension plan is "a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years." See also, Prior v. Innovative Communication Corp., 360 F.Supp.2d 704, 714 (D. V.I. 2005) ("an agreement to provide a pension plan is governed by the policies of unilateral contracting.") (citing Kemmerer, 70 F.3d at 288)); Pratt v. Petroleum Production Management Inc. Employee Sav. Plan & Trust, 920 F.2d 651, 661 (10th Cir. 1990); Hurd v.

Illinois Bell Tel. Co., 234 F.2d 942, 946 (7th Cir.1956), cert. denied, 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956); accord Hoefel v. Atlas Tack Corp., 581 F.2d 1, 4-5 (1st Cir.1978), cert. denied, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979)); Matter of M&M Transp. Co., 3 B.R. 722, 725 (D.C.N.Y. 1980) ("It has been held that the creation of a pension plan constitutes an offer of a unilateral contract by an employer to his employees. By performing the conditions of the offer, the employees accept the offer and a unilateral contract is thereby created.") (citing Denzer v. Purofied Down Products Corp., 474 F.Supp. 773, 776 (S.D.N.Y.1979); Hardy v. H. K. Porter Co., 417 F.Supp. 1175, 1183 (E.D.Pa.1976) (other citation omitted)).

"Once vested, an ERISA pension benefit becomes a statutory right." Prior, 360 F.Supp.2d at 714. Here, the plan explicitly provides that it is governed by and intended to be consistent with the provisions of ERISA. Specifically, the plan provides:

> GOVERNING LAW. This instrument shall be construed and governed pursuant to the Internal Revenue Code of 1954 and ERISA, as they now exist or may hereafter be amended, and, except to the extent preempted by federal law, according to the laws of the State of Florida, where it is made and executed.

(Defendant's Exh. No. 1, p. 85, Article XIX, ¶ 19.5).

Turning to the relevant federal statute, "Section 502(g) of ERISA, 29 U.S.C. § 1132(g), governs the awarding of attorney's fees [and] provides in pertinent part that: '[i]n any action under this subchapter ⋯ by a participant, beneficiary or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.'" Nachwalter v. Christie, 805 F.2d 956, 961 (11th Cir. 1986) (citing 29 U.S.C. § 1132(g)(1)). In the Eleventh Circuit, courts look to five factors for guidance in determining whether to award attorneys fees in civil ERISA actions: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of attorney's fees; (3) whether an award of attorney's fees would deter other persons acting under similar circumstances; (4) whether the parties requesting

attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. Nachwalter, 805 F.2d at 961-962 (citing Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir.1980). "In applying these criteria, however, courts should bear in mind ERISA's essential remedial purpose: to protect the beneficiaries of private pension plans." Nachwalter, 805 F.2d at 961-962 (citing Dennard v. Richards Group, Inc., 681 F.2d 306, 319 (5th Cir.1982)); Carr v. First Nationwide Bank, 816 F. Supp. 1476, 1486 (N.D.Cal.1993) ("A principal reason for the enactment of ERISA was 'to assure that individuals who have spent their careers in useful and socially productive work will have adequate incomes to meet their needs when they retire.'") (citing H.R. No. 93-807, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639, 4670, 4676). Here, the Court would weigh ERISA's goal of protecting beneficiaries of private pension plans against the Bankruptcy Code's goal of affording a fresh start to honest debtors. In re Martinez, 416 F.3d 1286, 1289 (11th Cir. 2005) (citing TranSouth, 931 F.2d at 1507 ("One of the primary purposes of the bankruptcy act is to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh….") (citations and quotations omitted).

With these goals in mind, analyzing the factors enumerated in Iron Workers with the circumstances present in this case, the Court concludes that the defendant should be required to pay the attorney fees and costs incurred by the plaintiffs in litigating this adversary proceeding. As to the first, fourth, and fifth factors in Iron Workers, the Court already has found multiple breaches of the defendant's fiduciary obligations including his failure to diversify and self-dealing. Moreover, for 16 years, the defendant fraudulently misrepresented the value of the Trust's assets to the three plaintiffs, who were the sole remaining unpaid beneficiaries under the Trust. As such, the resolution sought by the plaintiffs— the nondischargeability of their pension

funds— benefits each beneficiary under the ERISA plan. The plaintiffs' position is wholly meritorious, and there is more than sufficient indicia of culpability/bad faith to justify the defendant's payment of their attorney's fees. Regarding the third <u>Iron Workers</u> factor, the Court certainly hopes that requiring a debtor, who commits fraud/defalcation in his capacity as an ERISA plan trustee and files bankruptcy seeking to discharge the pension monies he owes to the plan beneficiaries, to pay the fees and costs incurred by those beneficiaries seeking to enforce their debt will have at least some deterrent effect on others.

As to the second <u>Iron Workers</u> factor, the Court does not currently have before it any specific information in regards to the amount of fees and costs incurred by the plaintiffs in bringing this action. However, the Court holds that the plaintiffs are entitled to a judgment for reasonable fees and costs. Accordingly, on or before **November 3, 2006**, plaintiffs' counsel is directed to file and serve a motion for an award of attorney's fees and costs, together with an accompanying affidavit attaching relevant billing records.  The defendant shall have 21 days after service of the motion to object.  Any objections will be considered at a subsequent hearing. If no objection is filed, the plaintiff is directed to submit a proposed Supplemental Final Judgment addressing fees and costs only.  A separate Final Judgment in favor of the plaintiffs and against the defendant/debtor and consistent with this Memorandum Opinion shall be entered contemporaneously herewith.

DONE AND ORDERED in Orlando, Florida, this 13th day of October, 2006.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies furnished to:

Debtors/Defendant:  Gary L. Goodwin and Mark K. Goodwin, 105 Alameda Drive, Merritt Island, FL  32952

Debtors/Defendant's Attorney:  David L. Wildman, P.O. Box 1029, Melbourne, FL  32902

Plaintiff:  Phillip W. Hearn, 4055 Quail Path Road, Cocoa, FL  32926

Plaintiff:  John Ely, 1311 N. Central, Flager Beach, FL  32136

Plaintiff:  Joseph Roberson, 8916 E. Treasure Island Ave., Leesburg, FL  34788

Plaintiffs' Attorney:  Andrew W. Menyhart, P.O. Box 451739, Merritt Island, FL  32954-1739

Plaintiffs' Attorney:  Shirley W. Ovletrea, P.O. Box 541677, Merritt Island, FL  32954